(No. 58106.—

INTERNATIONAL PAPER COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Michele L. Lulay, Appellee).

*Opinion Filed February 1, 1984.*

Westervelt, Johnson, Nicoll & Keller, of Peoria (Jeffrey W. Jackson, of counsel), for appellant.

Glenn J. Church, Ltd., of Peoria (Glenn J. Church, of counsel), for appellee.

JUSTICE MORAN delivered the opinion of the court:

Claimant, Michele L. Lulay, sought workmen's compensation benefits for an injury she sustained while in

the employ of the respondent, International Paper Company. An arbitrator awarded claimant compensation for temporary total disability for a period of 45⁴/₇ weeks under section 8(b) of the Workmen's Compensation Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.8(b)) and permanent partial disability to the extent of 15% of the use of her right arm under section 8(e) of the Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.8(e)). On review, the Industrial Commission, with one commissioner dissenting, found that petitioner's condition had not reached a state of permanency and, therefore, reversed the arbitrator's award for permanent partial disability and extended the award for temporary total disability to 90 weeks. The Commission also concluded that claimant was entitled to additional medical expenses and vocational rehabilitation under section 8(a) of the Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.8(a)) and remanded the cause to the arbitrator for rehearing on the question of a vocational rehabilitation award. The circuit court of Peoria County confirmed the decision of the Commission. Respondent has appealed pursuant to Rule 302(a) (73 Ill. 2d R. 302(a)).

The issues raised on review are whether the Commission's findings (1) that claimant's condition had not reached permanency and (2) that vocational rehabilitation was required, are against the manifest weight of the evidence.

At the hearing before the arbitrator, the claimant testified that on June 21, 1977 she was employed by the respondent as a shrink-film operator. In that capacity, she would take bundles of labels off a conveyor belt and then put them through a shrink-film machine which would seal the labels. On June 21, 1977, the labels on the belt were proceeding unusually fast because of a "big job that had to be out." As claimant was removing labels off the belt, another pile of labels was approaching. When the labels met, she felt a "pop" go through her right

arm. The arm began to ache, feel heavy and her elbow began to swell.

Upon return to work the following day, she reported her condition to her foreman and thereafter, on her own, sought treatment from a chiropractor, Dr. Robert L. Downs. He diagnosed claimant's condition as epicondylitis of the right elbow and treated it with ultrasound, a transcutaneous nerve stimulative unit, and hot packs. He also advised claimant to wear a sling and refrain from using her arm. The following day, claimant returned to work, and her foreman assigned her to a desk job in the bindery. She was placed on disability on July 19, 1977, when the desk job was completed.

Claimant next consulted an orthopedic surgeon, Dr. Paul Consigny, on June 28, 1977. In a report prepared by Dr. Consigny for the respondent, which was entered into evidence, the doctor diagnosed claimant's condition as "tennis elbow." He treated her with medication, heat, and injections in the elbow. Because of her failure to respond to this treatment, Dr. Consigny recommended rest and heat although he noted that claimant could continue to do some work if it did not involve use of her right arm. On August 30, 1977, claimant consulted with Dr. Paul Palmer, another orthopedic surgeon, who was respondent's company doctor. Dr. Palmer diagnosed tendonitis of the right elbow, treated claimant with therapy, and advised that she not work during the four-month period he treated her. He released her from his care on January 1, 1978. Claimant received temporary total disability payments from respondent for the period beginning July 19, 1977, and ending January 1, 1978.

Claimant returned to her job as a shrink-film operator on January 2, 1978. Although she wore an elbow brace, which had been prescribed by Dr. Palmer, she testified that she experienced a throbbing pain and tension in her right elbow when at work. She continued at her

job until October 6, 1978, at which time she took a six-month leave of absence for an unrelated condition.

Claimant returned to her job on March 13, 1979. She testified that in May of 1979, she began having difficulty lifting small bundles of labels without experiencing intense pain. Because of this, she consulted with a company doctor, Dr. C. J. Thomas, on May 29, 1979. Dr. Thomas' report, which was entered into evidence, indicated a possibility of minimal permanent disability of the right elbow. He treated the claimant with cortisone injections, prescribed an elastic elbow brace, and advised her to remain off work for the remainder of the week. Following the four-day rest, claimant returned to her regular job. At this time, however, the bundles of labels weighed from 30 to 40 pounds because of the unusually large size of the label involved. Claimant found the job much harder to perform and, therefore, during the following 3½ months she worked at three other production jobs within the company which she thought would be less physically demanding. They all proved to be just as difficult to handle. Claimant left work early on September 20, 1979, when she found herself dropping labels and experiencing pain in her right arm.

During the second week of August, claimant went to her family doctor, Dr. Wilbert S. Newcomer. Dr. Newcomer referred her to an anesthesiologist, Dr. Mohammed Shariff, who was affiliated with a pain management clinic. An appointment was arranged for October 10, 1979. Dr. Shariff examined claimant and also referred her to a psychologist for evaluation. The psychologist's report, entered into evidence, indicated that claimant was anxious to be rid of her pain and would be likely to cooperate with any future treatment. Dr. Shariff treated claimant with several different modes of therapy which gave her varying degrees of relief but were unable to alleviate the pain for any significant amount of time.

On November 9, 1979, claimant was sent to an orthopedic surgeon, Dr. David Conner, at the request of respondent. In a report sent to respondent's attorney and entered into evidence, Dr. Conner diagnosed chronic right lateral humeral epicondylitis. He stated that claimant would probably have some permanent partial disability and recommended changing her type of work to adjust to the condition.

Claimant continued her treatment with Dr. Shariff who recommended that she try to return to work. On May 27, 1980, she returned to work for the first time since September 20, 1979. Dr. Shariff recommended sedentary work that did not involve lifting more than 2 to 4 pounds. Claimant was assigned to work as a die cutter, which involved repetitive movement of her body as well as lifting. She was only able to work for 2½ hours because the burning sensation returned to her arm and the pain increased. At the hearing before the arbitrator, claimant testified that she was not working and had not worked since May 27, 1980. She stated that the only job at respondent's company which she felt was within her capabilities was the interoffice mail run, which was held by another employee.

Claimant testified, in the hearing before the Commission, that she had not worked since May 27, 1980. She also stated that she had contacted respondent in July of 1980 to inquire about the mail job and was told it was not open. No offer of employment had been made by respondent since the hearing on arbitration. Claimant further testified that she suffers from continuous pain and is greatly limited in carrying out routine household chores. She takes pain medication three times a day as well as applying heat to the elbow.

An evidence deposition of Dr. Shariff was also introduced into evidence on behalf of the claimant at the hearing before the Commission. Dr. Shariff stated that

claimant had lateral epicondylitis, which is a self-limiting disease that normally follows its own course to heal. He further stated that he would recommend rehabilitation for claimant in a much lighter or entirely different job.

In its decision and opinion on review, the Commission found that claimant was entitled to additional medical expenses and temporary total disability payments. In addition, the Commission found that the claimant's condition had not reached a permanent condition and that she was eligible for rehabilitation. As such, it remanded the case to the arbitrator to take further evidence consistent with *Hunter Corp. v. Industrial Com.* (1981), 86 Ill. 2d 489. In *Hunter*, this court remanded the case to the Commission for rehearing on the question of a vocational rehabilitation award and further held that "[u]ntil the claimant has completed a prescribed rehabilitation program, the issue of extent of permanent disability cannot be determined." (86 Ill. 2d 489, 501.) The claimant in *Hunter*, a disabled pipefitter, sought a rehabilitation award to cover tuition costs and expenses necessary to complete a college degree. The court noted that this form of rehabilitation, which was approved by the Commission and confirmed by the trial court, was based totally on the request of the claimant. There had been no evidence presented by trained rehabilitation personnel in support of claimant's proposed rehabilitation program. Thus, the court affirmed the Commission's finding of the need for rehabilitation but reversed that portion of the circuit court judgment which confirmed the Commission's specific vocational rehabilitation award and ordered the Commission to hold further hearings to determine the most appropriate program of rehabilitation.

Awards for vocational rehabilitation are granted pursuant to section 8(a) of the Workmen's Compensation Act, which provides, in pertinent part, that an employer shall compensate an injured employee "for treatment, in-

struction and training necessary for the physical, mental and vocational rehabilitation of the employee ***." (Ill. Rev. Stat. 1977, ch. 48, par. 138.8(a).) No procedures are provided, however, to guide the employer and employee in evaluating the need for rehabilitation or in developing an individualized rehabilitation program. As the court noted in *National Tea Co. v. Industrial Com.* (1983), 97 Ill. 2d 424, 431, "[i]n view of the frequency with which this issue arises, it seems evident that some flexible guidelines should be established." (See Gianforte, *Industrial Rehabilitation In Illinois—An Evolving Process*, 71 Ill. B.J. 668 (1983), for a general discussion of the "120-day rehab rule of the I.I.C." established to promote development of rehabilitation plans by the employer and insurance carrier.) In spite of the lack of a statutory procedure, however, "there is no prohibition against the Commission's calling witnesses whose testimony would be helpful or calling on the claimant to produce evidence to support [a particular] program." *Hunter Corp. v. Industrial Com.* (1981), 86 Ill. 2d 489, 499.

A series of cases decided subsequent to our decision in *Hunter* have involved questions regarding vocational rehabilitation. (See generally, *National Tea Co. v. Industrial Com.* (1983), 97 Ill. 2d 424; *Revere Copper & Brass, Inc. v. Industrial Com.* (1983), 97 Ill. 2d 388; *Caterpillar Tractor Co. v. Industrial Com.* (1983), 97 Ill. 2d 35; *C. D. Turner & Sons, Inc. v. Industrial Com.* (1983), 96 Ill. 2d 231; *McLean Trucking Co. v. Industrial Com.* (1983), 96 Ill. 2d 213; *Zenith v. Industrial Com.* (1982), 91 Ill. 2d 278.) These cases all proceeded through two levels of judicial review based on decisions of the Industrial Commission which were inherently incomplete. Although vocational rehabilitation awards were granted at the administrative level in all these cases, the rehabilitation orders were all couched in the general language of the authorizing statute (Ill. Rev.

Stat. 1977, ch. 48, par. 138(a).) Development of specific plans was left either to the parties or, in three cases (*McLean Trucking*, *Revere Copper* and *National Tea*) remanded to the arbitrator to hear further evidence on the vocational rehabilitation award.

In the instant case, we are, once again, confronted with a decision of the Industrial Commission which remanded the cause to the arbitrator to take further evidence on the question of a vocational rehabilitation award. The record, viewed by the Commission, revealed an injured employee who made repeated but unsuccessful efforts to return to her original job as well as several different company positions. In addition, claimant's medical history indicated a chronic condition which was only intermittently and partially alleviated by the numerous modalities of treatments attempted. On the other hand, the claimant neither suggested a rehabilitation program to the Commission nor called rehabilitation witnesses. Thus, while the Commission found claimant entitled to "necessary rehabilitation," it was unable to order a specific rehabilitation program.

The circuit court has jurisdiction to review decisions of the Industrial Commission by writ of *certiorari*. (Ill. Rev. Stat. 1977, ch. 48, par. 138.19(f)(1).) Section 19(f)(1) of the Act has since been amended effective Sept. 14, 1983, to provide for review by issuance of a summons. (Pub. Act 83—360; 1983 Ill. Laws 2608.) While the statute does not define the term "decision," this court has consistently held that only final determinations of the Commission are reviewable. (*American Structures, Inc. v. Industrial Com.* (1983), 99 Ill. 2d 40, 43-44; *International Harvester v. Industrial Com.* (1978), 71 Ill. 2d 180, 185; *Metropolitan Sanitary District v. Industrial Com.* (1967), 37 Ill. 2d 447, 449.) In the case at bar, the Commission ordered the case remanded to the arbitrator. The case reached the circuit court, therefore, before

administrative involvement in the case had been terminated. By its own terms, the decision of the Commission mandated further administrative proceedings. We find, therefore, that the decision of the Commission was not a final appealable determination. As such, the circuit court did not have jurisdiction to review the Commission decision. In light of this disposition, it is unnecessary to reach the merits of the issues raised on review.

We view, with concern, what appears to be a growing practice of the Commission to routinely order employers to pay for mental, physical and vocational rehabilitation of employees before sufficient evidence is presented to enable the Commission to order a specific plan of rehabilitation. Determination of the specific program, as noted above, requires further deliberation by either the litigants or the arbitrator. If judicial review is allowed before this determination is made, the courts will invariably be faced with piecemeal review of such cases, as litigants dissatisfied with the individualized rehabilitation program repeat the entire administrative and judicial review process. It is not unusual, in workmen's compensation cases, for five years to pass between the time of injury and final judicial determination. More than four years have passed since the claimant in this case initiated the action. The piece-by-piece review process described above can only exacerbate what is already an intolerably long delay. We hold, therefore, that decisions of the Industrial Commission which include generalized rehabilitation awards that require further determination as to the extent and nature of such rehabilitation are interlocutory and, therefore, not reviewable by the circuit court.

For the reasons given, the judgment of the circuit court of Peoria County is vacated, and the cause is remanded to the arbitrator for further proceedings.

*Vacated and remanded.*